In the Matter of VALERIE A. NEUNER, Appellant, v ELLSWORTH WEYANT, as Assessor of the Town of New Windsor, et al., Respondents.

Second Department, August 7, 1978

### APPEARANCES OF COUNSEL

*Fabricant, Lipman & Kennedy (Herbert J. Fabricant* of counsel), for appellant.

*Duggan, Crotty & Lucia (Andrew S. Krieger* of counsel), for Ellsworth Weyant and others, respondents.

*Louis J. Lefkowitz, Attorney-General (Richard G. Berger* of counsel), for State of New York, respondent.

### OPINION OF THE COURT

MARGETT, J.

At issue here is the constitutionality of legislation designed to delay implementation of a real property tax exemption aimed at the preservation of timber lands, where the said delaying legislation was passed after the "taxable status date" for assessing the value of petitioner's real property but was, by its terms, retroactive to a date prior to the said "taxable status date". Resolution of this issue requires inquiry as to the standards to be applied in determining whether retrospective civil legislation, and particularly tax legislation, constitutes a denial of due process.

Petitioner is the owner of approximately 86 acres of land situated in Orange County. At least 80 acres of this tract are covered by forests. The remaining acreage is improved by a single-family home occupied by the petitioner.

In 1974 the Legislature added a new section, 480-a, to the Real Property Tax Law (L 1974, ch 814 [references to former section 480-a shall be used to indicate the provisions of the statute as originally enacted and prior to its amendment by chapter 526 of the Laws of 1976]). Essentially, the new section limited taxation of "eligible" forest lands to their value as timber-producing property (as opposed to their value for other

purposes, such as residential development) (Real Property Tax Law, former § 480-a, subd 3, par [d] [L 1974, ch 814, § 3]). The stated purpose of the legislation was to make it economically feasible to preserve forest land for timber production, in the light of "increased demand for wood products and a shortage in present supplies" (L 1974, ch 814, § 1). Forest lands were to be "protected and enhanced as a viable segment of the state's economy and as an economic and environmental resource of major importance" (L 1974, ch 814, § 1).

In order to be eligible, a tract of at least 25 acres of land "devoted to and suitable for forest crop production" was required (Real Property Tax Law, former § 480-a, subd 1, pars [b], [d]). Application was to be made to the Department of Environmental Conservation for certificates of approval which would be filed with the local tax assessors and with the county clerk of the county in which the tract was situated. Applications for certification had to state that the "eligible tract shall be used for forest crop production for a minimum period of eight years" (Real Property Tax Law, former § 480-a, subd 2), and roll-back taxes on the amount of the exemptions received[1] over the previous five years were to be levied in the event that any certified land was "converted to a use which precludes management of the land for forest crop production" (Real Property Tax Law, former § 480-a, subd 7, par [a]). The applicable land values, for forest land *qua* forest land, were to be determined annually by the State Board of Equalization and Assessment (Real Property Tax Law, former § 480-a, subd 3, par [a]). Former section 480-a (subd 3, par [b]) of the Real Property Tax Law provided that these determinations of value "shall annually be certified by the state board [of equalization and assessment] to the assessor of each affected jurisdiction." This legislation was approved by the Governor on June 7, 1974 and was to become effective September 1, 1974 (L 1974, ch 814, § 4).

Petitioner promptly sought to avail herself of the new legislation. In the autumn of 1974 she applied to the Department of Environmental Conservation for certification of approximately 80 acres of her land. Her application was substantially approved and on March 25, 1975 the department certi-

---

1. The amount of the exemption would be the difference between the value of the land as timber-producing property and the value of the land at which it would be assessed were it not for section 480-a—i.e., the fair market value if sold for its "highest and best use".

fied that 79.6 acres of her property were entitled to be assessed as "forest land". The certificate was duly recorded the next day. On April 21, 1975 the certificate was amended to cover 81 acres of her property, to be assessed as "forest land". On April 23, 1975 the amended certificate was duly recorded. Meanwhile, on April 18, 1975 the State Board of Equalization and Assessment published a table entitled "$ PER ACRE FOREST VALUE FACTORS FOR COMPUTING FOREST VALUE ASSESSMENT CEILINGS (FOR CITY & TOWN ASSESSMENT ROLLS COMPLETED IN 1975 and VILLAGE ROLLS COMPLETED IN 1976)". It appears that this table, which represented the board's final determination as to "forest land" values for 1975, was "communicated" to the local assessors in April, 1975, although it was not formally "certified".[2]

The stage was thus set for the first day of May. In addition to the more popular commemorations observed on that day, May 1 is also the occasion on which real property is annually assessed for city, town and school district taxes—in the language of the Real Property Tax Law, it is the "taxable status date" of real property (Real Property Tax Law, §§ 302, 1302). On that date, "[a]ll real property shall be assessed in the city or town in which it is situated according to its condition and ownership *as of such date*" (Real Property Tax Law, § 302, subd 1 [emphasis supplied]). The assessment roll, however, is not prepared until somewhat later in the year. A tentative assessment roll is published on or before June 1 and, thereafter, persons aggrieved by the assessment of their property may seek administrative review of their assessment (Real Property Tax Law, §§ 506, 512). After the hearing of complaints, a final assessment roll is prepared and filed with the city or town clerk on or before the first day of August (Real Property Tax Law, §§ 512, 516).

On May 6, 1975, just five days after the "taxable status date" for the year, the Legislature enacted a provision that delayed the implementation of the forest land exemption (L 1975, ch 68, § 1). The exemption was to be applicable "only * * * to assessment rolls with taxable status dates occurring

2. Petitioner-appellant so alleges in the statement of facts in her brief. Respondents Weyant et al., state that the facts are not in dispute and that they are "willing" to have this court adopt petitioner's statement of facts. The Attorney-General appears to concede that there was communication of the values to the local assessors and that this communication was sufficient to satisfy the statute, since "Point III" of the Attorney-General's brief reads: "CERTIFICATION UNDER RPTL § 480-A DID NOT CREATE A CONTRACT BETWEEN THE STATE AND THE APPELLANT."

on or after July first, nineteen hundred seventy-six" (L 1975, ch 68, § 1). This delaying legislation was expressly made "retroactive to, and * * * in full force and effect from and after, September [1, 1974]", the day that the legislation creating the forest land exemption had become effective.

By memorandum dated May 9, 1975, the counsel's office of the State Board of Equalization and Assessment advised assessors of the delaying legislation and stated that "the tax exemption authorized under section 480-a * * * for forest lands may not be granted on assessment rolls prepared this year." No doubt because of the delaying legislation, the State Board of Equalization and Assessment never formally "certified" forest land values to local assessors.

Had petitioner been accorded the benefits of the forest land exemption in 1975, her property would have been assessed at approximately $26,000. Because of the delay in implementation occasioned by the enactment of chapter 68 of the Laws of 1975, her property was assessed at $533,400. After administrative review pursuant to section 512 of the Real Property Tax Law, her assessment was reduced to $505,000. Because the Board of Assessment Review had declined to compute her assessment on the basis of the forest land exemption, petitioner commenced a proceeding on or about August 19, 1975 for judicial review of her assessment.

Petitioner moved for summary judgment on the ground that chapter 68 of the Laws of 1975 (the delaying legislation) was unconstitutional insofar as it affected her. Special Term denied the motion. The *ratio decidendi* was that petitioner could not avail herself of the benefits of the forest land exemption in any event because the State Board of Equalization and Assessment had never "certified" forest land values to the local assessors as required by paragraph (b) of subdivision 3 of former section 480-a of the Real Property Tax Law. Special Term held this to be "a jurisdictional condition precedent" to the enjoyment of the benefits of the statute. The constitutional issue raised by petitioner was not reached. The order denying petitioner's motion for summary judgment was entered on October 19, 1976.

Prior to that time, during the summer of 1976, the Legislature literally rewrote the forest land exemption (L 1976, ch 526). The new provisions of section 480-a of the Real Property Tax Law contain more stringent eligibility requirements (e.g., to qualify, one must now have at least 50 contiguous acres and

must commit his tract "to continued forest crop production for the next succeeding ten years * * * [s]uch commitment * * * [to] be made annually [during each subsequent year]", Real Property Tax Law, § 480-a, subd 1, par [d]; subd 3, par [a], cl [i]), and it increases the penalty for conversion from "forest crop production" (Real Property Tax Law, § 480-a, subd 8).[3] It also apparently decreases the amount of the exemption.[4] The Governor's memorandum of approval states, *inter alia,* that the provisions of former section 480-a of the Real Property Tax Law: "were so loosely drawn that it became apparent that the tax exemption might be taken advantage of by developers, real estate speculators, rod and gun clubs and large estate owners, and not just timber producers, *and would result in large shifts in tax burdens among property owners in various localities.* Because of these defects, the application of § 480-a has been delayed at two successive legislative sessions, most recently by Chapter 422 of the Laws of 1976, and is now due to take effect on July 1, 1977" (NY Legis Ann, 1976, p 397; emphasis supplied). The Governor's memorandum further notes (p 397) that the legislation approved "clearly tightens the provisions of § 480-a". (See, also, Memorandum of Senator Bernard C. Smith, NY Legis Ann, 1976, pp 346-347.)

Also, prior to the October 19, 1976 entry of the order denying petitioner's motion for summary judgment, petitioner commenced a second proceeding—this one to review the 1976

---

**3.** Instead of imposing roll-back taxes on the amount of the exemptions received over the previous five years, the revised section imposes a penalty equal to the greater of (a) "two times the taxes which would have been levied on the preceding completed assessment roll were the converted tract * * * not certified," or (b) a roll-back tax "computed by multiplying by two and one-half the amount of taxes that would have been levied on the [amount of the] forest land exemption[s]" taken for up to 10 years (Real Property Tax Law, § 480-a [subd 8, pars [a], [c]). This change is a very significant one because under the former section "the penalty * * * [was] not a sufficient deterrent to prevent a landowner from converting his land to a use other than forest crop production" (Memorandum of Senator Bernard C. Smith, NY Legis Ann, 1976, pp 346-347).

**4.** Subdivision 4 of section 480-a provides, in essence, that the exemption shall now be the *lesser* of (a) 80% of the assessed valuation of the land, or (b) the amount by which (i) the assessed valuation of the land exceeds (ii) an amount figured by multiplying $40 per acre by "the latest state equalization rate or special equalization rate established for such jurisdiction". At best then, petitioner's *exemption* could now be no more than about $400,000 ($80% x $500,000) and her land would, in that case, be assessed at approximately $100,000 (as opposed to $26,000 under the former statute). Her assessment would be even higher if the amount obtained through application of the formula [(assessed valuation)—($40/acre x applicable equalization rate)] proved to be less than 80% of her assessed valuation.

assessment of her property. The petition therein, dated August 18, 1976, alleges that her land was (again) assessed at $505,000.

A stipulated set of facts was submitted to the court in connection with both proceedings. In a decision dated May 18, 1977, the court held that both petitions must be dismissed because the prior decision and order, denying petitioner's motion for summary judgment on the grounds of "lack of certification", constituted the law of the case. Petitioner now appeals the resulting order. Petitioner states, in her brief, that she "intends to bring up for review the order * * * entered * * * October 19, 1976" which denied her motion for summary judgment.

We dispose of a procedural problem at the outset. For the purposes of this appeal from the order dismissing both petitions, Special Term's reasoning in its denial of petitioner's motion for summary judgment on the 1975 petition is not binding upon this court as the law of the case. The October 19, 1976 order is a nonfinal order "which necessarily affects the final judgment"[5] (see CPLR 5501, subd [a], par 1) and, hence, that order is reviewable on this appeal.

We find that Special Term erred in holding that formal certification of forest land values by the State Board of Equalization and Assessment was a jurisdictional condition precedent to the enjoyment of the benefits of the statute. Read in context, the requirement that forest land values be "annually * * * certified by the state board [of equalization and assessment] to the assessor[s]", is simply a direction that such values be communicated to local assessors. Insofar as any formal "certification" is contemplated, we hold such a requirement to be directory rather than mandatory (see McKinney's Cons Laws of NY, Book 1, Statutes, § 171, and cases cited therein). Accordingly, the "certification" requirement was satisfied in substance because the State board's final determination as to forest land values for 1975 *was* communicated to the local assessors in April, 1975.

Insofar as petitioner's 1975 proceeding is concerned, we are squarely faced with the issue whether the retrospective application of the "delaying" legislation—chapter 68 of the Laws of 1975—is unconstitutional. But even were we to hold that such

5. The word "judgment" as used in paragraph 1 of subdivision (a) of CPLR 5501 was not intended to exclude appeals from final "orders" (7 Weinstein-Korn-Miller, NY Civ Prac, par 5501.01).

retrospective application is a denial of due process with respect to the 1975 tax assessment, under no rational view (short of voiding the entire chapter) could we hold that petitioner was entitled to the forest land exemption in 1976. Certainly, as of May 6, 1975, the effective date of chapter 68 of the Laws of 1975, utilization of the forest land exemption was delayed until "taxable status dates occurring on or after July [1, 1976]" (L 1975, ch 68, § 1). Petitioner's taxable status date for 1976 was May 1. Even if petitioner could arguably take advantage of an exemption which took effect *after* her "taxable status date" but before completion of the final assessment roll (cf. *Matter of Pullman,* 52 Misc 1; see, also, *Matter of Municipal Housing Auth. of City of Schenectady v Department of Assessment & Taxation of City of Schenectady,* 54 Misc 2d 932), it is noted that on June 21, 1976, 10 days before the forest land exemption was to again become effective, the Legislature once more delayed the effective date of the exemption—this time to July 1, 1977 (L 1976, ch 422, § 1).

The forest land exemption embodied in former section 480-a of the Real Property Tax Law was therefore not in force during any part of 1976 and the petition brought in 1976 was properly dismissed. There remains the principal issue of whether chapter 68 of the Laws of 1975 resulted in a denial of due process by retrospectively denying petitioner a tax exemption to which she was entitled by the law as it stood on May 1, 1975—the date on which her property "shall be assessed * * * according to its condition and ownership *as of such date"* (Real Property Tax Law, § 302, subd 1; emphasis supplied).

■ There is universal agreement that retrospective tax legislation is not "necessarily" unconstitutional *(Welch v Henry,* 305 US 134, 146; *People ex rel. Beck v Graves,* 280 NY 405, 409; *Wilgard Realty Co. v Commissioner of Internal Revenue,* 127 F2d 514, cert den 317 US 655) and, in fact, the courts have generally upheld retroactive tax laws *(Welch v Henry, supra; United States v Hudson,* 299 US 498 [Silver Purchase Act of 1934]; *Milliken v United States,* 283 US 15 [gifts in contemplation of death]; *Purvis v United States,* 501 F2d 311, cert den 420 US 947 ["interest equalization tax" levied on purchases of foreign securities by Americans]; *Matter of Freedomland,* 480 F2d 184, affd *sub nom. Otte v United States,* 419 US 43 [allowing New York City to withhold a part of wage claims paid to former employees of a bankrupt, even though wages were earned before the effective date of the New

York City income tax]; *Shanahan v United States,* 447 F2d 1082 [upheld application of statute imputing interest in installment contracts to transaction which occurred one month prior to enactment]; *Thorp's Estate v Commissioner of Internal Revenue,* 164 F2d 966, cert den 333 US 843 [value of remainder interest in trust]). "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations" *(Usery v Turner Elkhorn Min. Co.,* 428 US 1, 16), and "taxpayers have no vested right either in any decision or in any statute" *(Harte v United States,* 152 F Supp 793, 797, affd 252 F2d 259). Retroactive tax legislation constitutes "legislative decision-making in the economic domain" and "[o]rdinarily, as long as the legislature's economic policies fall within the scope of its constitutional authority, foster no invidious discrimination, infringe no independent constitutionally protected interest, and reasonably serve legitimate legislative purposes, the substantive requirements of Due Process are satisfied" *(Matter of Cartridge Tel.,* 535 F2d 1388, 1392).

Nevertheless, the courts have held that retrospective tax legislation constitutes a denial of due process when, in the light of "the nature of the tax and the circumstances in which it is laid", the law is "so harsh and oppressive as to transgress the constitutional limitation" *(Welch v Henry,* 305 US 134, 147, *supra; Matter of Lacidem Realty Corp. v Graves,* 288 NY 354; see, also, *United States Trust Co. of N. Y. v New Jersey,* 431 US 1, 17, n 13). This standard of oppressiveness is "usually a question of degree" *(People ex rel. Beck v Graves,* 280 NY 405, 409, *supra).*

A number of the considerations that have influenced the courts in their application of this standard may be identified. Perhaps the classic example of a tax which has been held to be overly "harsh and oppressive" were it to be applied retrospectively is the gift tax *(Coolidge v Long,* 282 US 582; *Untermyer v Anderson,* 276 US 440). The rationale is that retrospective taxation of gifts would levy on a voluntary act by one who might not have acted as he had if the ramifications of subsequent legislation had been known to him (see *Welch v Henry, supra). Welch,* the leading decision of the Supreme Court of the United States in this area, focused on this approach in upholding Wisconsin's retrospective taxation of dividends received within two years prior to the enactment of the legislation. The court distinguished the gift tax cases on the ground that "the nature or amount of the tax could not

reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event" *(Welch v Henry, supra,* p 147). The taxable event in *Welch v Henry,* the receipt of dividends, was viewed as distinguishable because it could not be "assume[d] that stockholders would refuse to receive corporate dividends even if they knew that their receipt would later be subjected to a new tax or to the increase of an old one" *(Welch v Henry, supra,* p 148).

The mere levying on events where the taxpayer has done some affirmative act is not dispositive, however, since "[a]lmost all new laws upset some expectations, and frequently changes are made in the legal consequence of prior conduct" *(Hazelwood Chronic & Convalescent Hosp. v Weinberger,* 543 F2d 703, 708, vacated on other grounds *sub nom. Hazelwood Chronic & Convalescent Hosp. v Califano,* 430 US 952). The distinction drawn between taxes based upon "voluntary acts" of the taxpayer and those incidental to the passive receipt of income, simply looks to one aspect of an over-all course of conduct wherein a taxpayer has changed his position in reasonable reliance upon existing law. The broader focus is upon whether the taxpayer's "reliance" has been justified under all the circumstances of the case and whether his "expectations as to taxation [have been] *unreasonably* disappointed" *(Wilgrad Realty Co. v Commissioner of Internal Revenue,* 127 F2d 514, 517, *supra,* emphasis supplied). This focus on what might be termed the "reliance" factor is obvious in many of the decisions since, indeed, "at some point [it] becomes the predominant element in the equation" *(Matter of Chrysler Props. v Morris,* 23 NY2d 515, 521).

In *United States v Hudson* (299 US 498, *supra),* where the Supreme Court of the United States upheld a 35-day retrospective period for a tax on profits accruing from private dealing in silver, the court took note of the following facts: (a) for some months prior to enactment of the legislation, there was strong pressure for legislation requiring increased acquisition and use of silver by the Government and several bills providing therefor were presented in the House of Representatives and the Senate; (b) one day before the taxpayer sold silver futures which became subject to tax, the President sent to Congress a message recommending legislation for increasing the amount of silver in the Government's monetary stocks and further recommending the imposition of a tax on profits

from private dealing in silver; (c) on the same day the taxpayer sold the aforesaid silver futures, the bill which was to become the challenged legislation was introduced in Congress.[6] It is apparent that the public's forewarning of the legislation which was subsequently enacted played a significant role in the court's determination that due process rights were not offended.

Likewise, in *Purvis v United States* (501 F2d 311, cert den 420 US 947, *supra),* where an "interest equalization tax", levied on purchases by Americans of foreign securities, was signed into law on September 2, 1964, but was to be effective as of July 18, 1963, the court noted that the President had proposed such legislation in a message to Congress on July 18, 1963 and that he had made it clear that if the tax was to achieve its purpose, it was essential that legislation creating the tax be made effective as of the date of the presidential message. "Otherwise a rush by investors to beat the deadline would serve to aggravate the problem [of a serious balance of payments deficit] and render the proposal self-defeating" (501 F2d, at p 312). It was further noted that the President's message was well publicized in the newspapers and financial journals and that the market in foreign securities was promptly affected. Accordingly, it was held that the retrospective application of the tax did not constitute a denial of due process, notwithstanding the fact that the taxpayer's transactions in foreign securities were "voluntary act[s]."

The protection of reasonable expectations underlies two other considerations which have loomed important in the cases. "[T]he mere abolishment of an opportunity to take measures to become free of a tax violates no rights" *(People ex rel. Haim v Chapman,* 274 App Div 132, 135). On the other hand, the retroactive application of a law may be a denial of due process where the taxpayer "had obtained a sufficiently certain right to the money" prior to the enactment of the said law *(Matter of Chrysler Props. v Morris,* 23 NY2d 515, 519, *supra* [petitioner's right to a tax refund jeopardized by retroactive legislation giving New York City the right to judicial review of the State Tax Commission's determinations]). Thus, the strength of a taxpayer's claim to assets is yet another consideration.

---

6. The taxpayer actually sold futures on two dates—May 23, 1934 (the day the bill was introduced) and May 29, 1934.

The length of the period of retrospection has been a significant factor in the cases (in some instances it was the only apparent factor). In *United States v Hudson (299 US 498, 500, supra),* where the period was 35 days, the court held that "[a]s respects income tax statutes it long has been the practice of Congress to make them retroactive for relatively short periods so as to include profits from transactions consummated while the statute was in process of enactment, or within so much of the calendar year as preceded the enactment; and repeated decisions of this Court have recognized this practice and sustained it as consistent with the due process of law clause of the Constitution." On the other hand, in striking down so much of a statute as taxed income received by New York residents from real property in another State, the New York Court of Appeals observed that "[n]o case has ever held such a statute to be valid which attempted to permit a retroactive assessment of a tax for as long a period as sixteen years" *(People ex rel. Beck v Graves,* 280 NY 405, 409, *supra).* (See, also, *Matter of Lacidem Realty Corp. v Graves,* 288 NY 354, 357, *supra* [law taxing landlords' receipts from sub-metering electric current passed in 1941—made retroactive to 1937— held that full retroactivity " 'is so harsh and oppressive as to transgress the constitutional limitation' "].) While a mechanical "time" test may seem simplistic, it is apparent that these cases protect very reasonable expectations that at some point in time a taxpayer will secure repose from the taxation of transactions which have, in all probability, been long forgotten.

Finally, the public purpose to be served by retroactive civil legislation should be examined. Relatively short retrospective periods are commonly upheld because of the Government's legitimate concern that evasive measures taken after introduction of a bill but before enactment might frustrate the purpose of the legislation *(Purvis v United States,* 501 F2d 311, cert den 420 US 947, *supra;* see, also, *United States v Hudson,* 299 US 498, *supra).* "[A]bsent any showing of the public interest to be served by * * * retroactive legislation * * * [such legislation] should not be sanctioned" *(Matter of Chrysler Props. v Morris,* 23 NY2d 515, 522, *supra).*

At bar, none of the relevant considerations militate in petitioner's favor. Petitioner took no "voluntary actions" in reliance upon the exemption. Conceivably a taxpayer could be influenced by the more favorable property tax treatment to

retain property which might otherwise be sold. But the five days of actual retrospective application here present would not be expected to seriously damage an owner who was really intent on selling land that did not receive the exemption.[7] In any event, there is no indication that petitioner actually intended to sell her land if her property taxes were not lowered. Furthermore, while the record is devoid of any evidence that the pending legislation was publicized, one can reasonably be certain that the bill or bills which were eventually enacted into law had been introduced prior to May 1, 1975. In sum, this is not a case where the retrospective application of a statute would upset the taxpayer's reasonable reliance upon previously existing law (Wilgard Realty Co. v Commissioner of Internal Revenue, 127 F2d 514, cert den 317 US 655, supra).

Petitioner lost merely "an opportunity to take measures to [lower her] * * * tax" liability (People ex rel. Haim v Chapman, 274 App Div 132, 135, supra). The "delaying legislation" at issue did not deprive her of funds to which she had "a sufficiently certain right" (cf. Matter of Chrysler Props. v Morris, 23 NY2d 515, 519, supra); nor did it result in the taxation of assets that had not been taxed previously (cf. People ex rel. Beck v Graves, 280 NY 405, supra). If the converse situation had been the case, with the exemption effective after the taxable status date[8] but before the filing of the final assessment roll on or before August 1, petitioner would probably have been able to avail herself of the said exemption (Matter of Pullman, 52 Misc 1, supra; see, also, Matter of Municipal Housing Auth. of City of Schenectady v Department of Assessment & Taxation of City of Schenectady, 54 Misc 2d 932, supra). Thus, petitioner's claim, that she had a "vested right" to the tax exemption as of the "taxable status date", is without merit.

---

7. Although it could be argued that the actual period of retrospective application was more than eight months, and that an owner of prospectively eligible land might have sold at any time during those eight months but for the hope of realizing the exemption, it is clear that no claim of unconstitutionality could arise had the "delaying legislation" embodied in chapter 68 of the Laws of 1975 been enacted prior to May 1, 1975. That being the case, petitioner could not reasonably have expected to receive the exemption until at least May 1, 1975.

8. This assumes that the effective date of the hypothetical exemption would not be couched in terms of a "taxable status date". For example, if an exemption were passed "effective May 6, 1975", petitioner would probably be able to take advantage of such an exemption for purposes of her 1975 assessment—even though the "taxable status date" for her property was prior to the effective date of the exemption.

The length of the effective period of retrospection here was only five days (see *Welch v Henry,* 305 US 134, *supra* [two-year retrospective period upheld]; see, also, the following cases where retrospective taxes were upheld: *United States v Hudson,* 299 US 498, *supra* [35 days]; *Purvis v United States,* 501 F2d 311, cert den 420 US 947, *supra* [14 months]; *Shanahan v United States,* 447 F2d 1082, *supra* [one month]). "Taxpayers must expect that fundamental changes in tax laws may be made at any time in a taxable period to be effective for the entire period and in addition for some time previously * * * That is to say, retroactivity in taxation which would otherwise be so arbitrary as to be unconstitutional may escape such disability if it is not too great in point of time" *(Wilgard Realty Co. v Commissioner of Internal Revenue,* 127 F2d 514, 517, *supra).*

It is apparent also that chapter 68 of the Laws of 1975 served an important public purpose by delaying the effective date of a "loosely drawn" tax exemption which would, in all probability, have permitted large-scale tax avoidance by land owners who were not intended to be benefited. The result would have been "large shifts in tax burdens among property owners in various localities" (Governor's memorandum upon approval of chapter 526 of the Laws of 1976, NY Legis Ann, 1976, p 397), without any justification for such shifts. The delay brought about by chapter 68 permitted the Legislature time to redraft section 480-a of the Real Property Tax Law so that the desired benefits of protecting genuine timber lands could be obtained without any of the detriments which would have ensued from permitting the wholesale removal of a substantial percentage of the value of nontimber producing forest lands from the real property tax rolls. The need to avoid the implementation of a bad law was a compelling one, and it far outweighed petitioner's tenuous interest in obtaining a lower assessment in 1975 (cf. *Matter of Chrysler Props. v Morris,* 23 NY2d 515, *supra).*

Accordingly, the order appealed from should be, in all respects, affirmed.

MARTUSCELLO, J. P., DAMIANI and O'CONNOR, JJ., concur.

Order of the Supreme Court, Orange County, dated June 8, 1977, affirmed, without costs or disbursements.