OPINION OF THE COURT
Arthur E. Blauvelt, J.
These are two CPLR article 78 proceedings and five article 7 (Real Property Tax Law) proceedings. The CPLR article 78 proceedings (Proceedings Nos. 1 and 2) seek judgments annulling the certifications of eligibility of certain forest lands owned by the City of Rochester in Livingston and Ontario Counties for partial tax exemption under section 480-a of the Real Property Tax Law. These certificates under review were issued by the New York State Department of Environmental Conservation (DEC). The article 7 proceedings (Proceedings Nos. 3, 4, 5, 6 and 7) are tax review proceedings involving the same lands, whereby the petitioner City of Rochester seeks partial exemption of the subject premises from real property taxation. These seven proceedings involve common questions of law and by mutual agreement of the parties they were argued and submitted together. There are, at this stage, no issues of fact.
*23 One preliminary procedural matter should first be disposed of. The venue of Proceeding No. 1 was properly laid in Livingston County. Venue in each of the other six proceedings was laid in Monroe County, notwithstanding the fact that the proceedings relate to the right of partial exemption from real property taxation on real property located in the Towns of Livonia, Conesus and Springwater in Livingston County and the Towns of Canadice and Richmond in Ontario County. It is the opinion of this court that the proceedings should be venued in the county where the real property is situated (CPLR 507). Accordingly, this court sua sponte changes the venue as follows: Proceedings Nos. 2, 6 and 7 from Monroe County to Ontario County, Proceedings Nos. 3, 4 and 5 from Monroe County to Livingston County.
A brief summary of the facts leading up to these proceedings is in order.
By chapters 387 and 771 of the Laws of 1872 and chapter 754 of the Laws of 1873, the State Legislature empowered the City of Rochester (City) to appoint a Board of Water Commissioners to set up a water supply system to provide its citizens, and, by contract, neighboring communities through which parts of the system might pass, with pure and wholesome drinking water; to utilize the waters of Hemlock and Canadice Lakes; to construct such pipes, conduits, aqueducts and other facilities as might be needed to bring the water into the City; to acquire, by purchase or condemnation, all lands necessary for the operation of the system and to protect the quality and supply of the water.
The board of commissioners did so and among other things it acquired upwards of 7,000 acres of land, mostly forested, south of the City situated in the Towns of Livonia, Conesus and Springwater in Livingston County and in the Towns of Canadice and Richmond in Ontario County, as an upland watershed area to protect the quality and supply of the waters from these lakes. These waters are not processed through a filtration plant. They constitute a substantial portion of the City’s drinking water with the balance coming from Lake Ontario.
Throughout this period of about 100 years the watershed lands have always been assessed and taxed on the same basis as all other lands, presumably at their full value based upon their highest and best use.
As will be demonstrated hereafter, the Legislature has *24 found that forest lands, despite their potential for timber production, can no longer be economically maintained and operated on such a taxable basis with practical result that forest acreage has dwindled to the point where it threatens to cease to be a viable resource and asset of New York State and its economy.
In view of this danger, and since early in this century, the Legislature has enacted legislation to encourage the owners of forest lands to maintain their forests through the medium of making them partially exempt from property taxes, but with no notable success, either because of the complicated and expensive procedures required to seek the partial exemption or because assessments in the past have not been as excessive as in recent years, as is demonstrated by Exhibit 1 attached to the Attorney-General’s brief.
In the past 50-odd years, such legislation is found in chapter 610 of the Laws of 1926 (Tax Law, § 16), chapter 431 of the Laws of 1927 (amdg Tax Law, § 16), chapter 572 of the Laws of 1930 (further amdg Tax Law, § 16), chapter 346 of the Laws of 1931 (further amdg Tax Law, § 16), chapter 470 of the Laws of 1933 (renumbering Tax Law, § 16 to become Tax Law, § 13) and chapter 959 of the Laws of 1958 (which recodified real property taxation by enacting the Real Property Tax Law wherein was included § 480). By chapter 814 of the Laws of 1974, section 480 of the Real Property Tax Law was radically amended by the addition of subdivision 9 and the addition of new section 480-a which, with passage of time, will be the principal section of the Real Property Tax Law dealing with the partial exemption of forest lands from taxation.
In section 1 of chapter 814 of the Laws of 1974, the Legislature states its findings, intention and declaration of purpose in amending section 480 and enacting section 480-a of the Real Property Tax Law, as follows: "The legislature hereby finds and declares that lands presently devoted to growth of forest crops are often assessed at a level which renders continued dedication to such use uneconomical. In spite of increased demand for wood products and a shortage in present supplies, use of land for timber production is becoming increasingly economically unfeasible due to assessment practices which do not take into account the present use of the property being assessed. Lands devoted to growth of forest products should be assessed at a level which recognizes this use rather than at a level reflecting devotion of the land to another purpose. It is *25 the purpose of this chapter to provide a means by which present and future forest lands may be protected and enhanced as a viable segment of the state’s economy and as an economic and environmental resource of major importance.”
Since the intent of the Legislature is clearly to preserve and protect one of its vital resources rather than to subsidize a lagging lumber industry, it matters little who owns the forests so long as they are preserved and managed consistently with good forestry practices.
It soon became apparent that section 480-a of the Real Property Tax Law was too loosely drawn and that the partial tax exemption might be taken advantage of by developers, real estate speculators, rod and gun clubs and large estate owners and not just timber producers (Matter of Neuner v Weyant, 63 AD2d 290). Accordingly, the effective date of the act was postponed, retroactively, and the matter was given very intensive study. As a result, initial section 480-a of the Real Property Tax Law was extensively amended by the present section 480-a (L 1976, ch 526).
Three very important additions were made, none of which had been included in the initial section 480-a of the Real Property Tax Law nor its predecessors, section 480 of the Real Property Tax Law and sections 13 and 16 of the Tax Law. These additions must be read together. First, the adverb "exclusively” was added to qualify the requirement that the land must be "devoted to and suitable for forest crop production” (Real Property Tax Law, § 480-a, subd 1, par [b], as amd by L 1976, ch 526). Second, for the first time, a sound forest management plan, approved by the DEC, must accompany the application for certification of eligibility (Real Property Tax Law, § 480-a, subd 2, as amd by L 1976, ch 526). Third, and most significantly in connection with the requirement of exclusivity, the section now requires: "Such management plans shall also specify any use of the tract other than forest crop production which would be permitted as being compatible with and supportive of such production and shall contain requirements and standards for the conduct or establishment of any such use to assure such compatibility and support.” (Real Property Tax Law, § 480-a, subd 2, as amd by L 1976, ch 526.)
Section 480-a of the Real Property Tax Law became effective July 1, 1977 to apply to all assessing units on their next tax status dates which, in all five of the towns concerned, was *26 May 1, 1978. The section also requires the owner to commit his eligible forest lands to forest crop production, trimming and harvesting according to the specifications of the plan for a minimum of 10 years and to record the commitment in the appropriate office, pay a stumpage tax as trees are harvested and provides for heavy rollback taxes should he convert the forest to an unauthorized use during the period of the commitment or fail to follow the forest management plan, but extends substantial partial tax exemption to the owner if he adheres to the plan.
In the méantime, as directed by the Legislature in section 480-a of the Real Property Tax Law, DEC commenced preparation of rules and regulations to implement section 480-a of the Real Property Tax Law and published a notice that it was doing so in the Environmental Notice Bulletin; also it published notice that nine public hearings would be held at stated times and places. It also published a notice on August 31, 1977 that an Environmental Impact Statement (EIS) would be prepared. Later, however, having determined that since the proposed rules and regulations were to be confined to administration and procedure only, thus having of themselves no significant impact on the environment, instead of preparing an EIS at that stage it made a determination to that effect, called a negative declaration, and that was duly published March 8, 1978. DEC decided that instead it would study each individual application as made and determine whether the proposed action might, or would not, have a significant impact on the environment. While the rules and regulations were finalized some time earlier, they were not officially promulgated until April 25, 1978 and they were filed with the Secretary of State and published by him in 6 NYCRR Part 199.
In the meantime, and early in 1978, the City employed a consulting firm of forest management specialists, Forecon, Inc., to study its upland watershed forests and draft an appropriate forest management plan applicable to its certifiable tracts. This was done and it was submitted together with the City’s initial application for eligibility certifications to DEC, the certifying agency, in February, 1978.
The plan, as initially filed, was deficient in several respects including erosion control and lumber road, bridge and skid trail construction. Thereafter, the State’s foresters worked closely with Forecon’s personnel for about two months with *27 the result that a much more detailed and comprehensive management plan was prepared and it was filed on April 14, 1978. Section K of the plan detailed DEC’S reasons why an EIS would not be required and why the revised plan would have no significant impact on the environment. Since the applicátions could not be officially accepted until the official rules and regulations were promulgated on April 25, 1978, new applications were officially filed with the final plan on April 26, 1978, on which date 5,745 acres of the City’s watershed property were certified as eligible for partial tax exemption and a negative declaration was also duly filed with a detailed statement of why the proposed action would have no significant impact on the environment, i.e., why an EIS was not required.
The acreage so certified and the towns wherein it is located, being the acreage upon which the assessors should grant partial tax exemption for the current tax year, are:
Livonia 934 acres
Conesus 1,154 acres
Canadice 3,013 acres
Richmond 39 acres
Springwater 605 acres
Total 5,745 acres
Despite the fact that the commitments were duly recorded and all other required documents and certifications filed with the appropriate boards of assessors prior to May 1, 1978, the tax status date, all of the assessing bodies refused to honor them thereby denying partial tax reduction through appropriate exemptions in assessments.
These seven proceedings resulted.
The CPLR article 78 proceedings are based upon the contention that the certifications are illegal for three reasons; that the certifications were not the result of legal procedure because no EIS was filed prior to promulgation of 6 NYCRR Part 199 and because none was filed prior to certification of the 5,745 acres involved; that section 480-a of the Real Property Tax Law does not apply to municipally owned forest land; that the land itself is not exclusively devoted to forest crop production because it is also watershed land to protect the quality and supply of part of the City’s water system.
Initially, the court finds that the procedure was legal. *28 ECL article 8, the State’s Environmental Quality Review Act (SEQRA), as implemented by 6 NYCRR Parts 617 and 618, both authorize DEC to use its expertise in determining whether or not a proposed action may have a significant impact on the environment. If it determines that it may, it will require an EIS. If it determines that it will not, it will issue a negative declaration. The record overwhelmingly supports both negative declarations.
As to the second contention, municipally owned forest land is eligible for treatment under section 480-a of the Real Property Tax Law. Petitioners’ contention that it is not is principally based on the fact that article 4 of the Real Property Tax Law, the tax exemption article, contains two titles, Title 1 captioned "Public Property” and Title 2 captioned "Private Property”. Section 480-a of the Real Property Tax Law is in Title 2. Nevertheless, the statute says "owner”, without restriction, and the municipality is the "owner”. The title of a statute is not part of the statute and while it may be resorted to as an aid in interpreting a statute where the wording is unclear or ambiguous, it may not be where the wording is clear. The wording of section 480-a of the Real Property Tax Law is clear (Squadrito v Griebsch, 1 NY2d 471, 475). Also, the Court of Appeals said in Matter of Erie County Agric. Soc. v Cluchey (40 NY2d 194, 200), Courts should not, however, add restrictions or limitations where none exist, nor should they interpret what has no need of interpretation.”
Also, it can be assumed that when the Legislature delegated the responsibility of administering section 480-a of the Real Property Tax Law to DEC and the duty of implementing it with official rules and regulations, it was well aware of the construction which DEC and its predecessor, the Department of Conservation, had consistently placed upon the unqualified word "owner” as the same has been employed for years in the various forest land exemption statutes (Tax Law, §§ 13, 16; Real Property Tax Law, § 480). The department has always construed "owner” as including municipalities holding legal title to forest lands.
Illustrative of this are Exhibits 1, 2 and 3 attached to the Attorney-General’s brief.
Exhibit 1 is a two-page dissertation by the Department of Conservation on the State’s forest tax laws, originally known as "The Fisher Forest Tax Law” (L 1912, ch 249), from 1912 to date of its publication in its official bulletin in 1963 which *29 concluded with an explanation of the then effective section 480 of the Real Property Tax Law. On the first page which discussed the major provisions of that statute, the following appears: "Who may apply? — Any owner, private, corporate or public, who believes the woodland to be eligible.”
Exhibit 2 is a certification of eligibility for partial tax exemption of 357 acres of forest land in the Town of Poland owned by the City of Jamestown, by authority of section 13 of the Tax Law as amended by chapter 346 of the Laws of 1931, dated September 16, 1940.
Exhibit 3 is a certification of eligibility for partial tax exemption of 300 acres of forest land in the Town of Ephratah owned by the Village of St. Johnsville, by authority of section 16 of the Tax Law as amended by chapter 572 of the Laws of 1930, dated November 17,1930.
Accordingly it could have been no surprise to the Legislature that when DEC promulgated its official rules and regulations implementing section 480-a of the Real Property Tax Law it incorporated the following definitions in 6 NYCRR 199.16), "owner” as being the person having title to eligible lands, and subdivision (p), "person” as "any individual, public or private corporation, political subdivision, government agency, department or bureau of the State, municipality, industry, partnership, association, firm, trust estate or any other legal entity whatsoever.” (Emphasis supplied.)
Not only does this broad definition establish the intent that municipal corporations are eligible, but, more importantly, it emphasizes the legislative intent that all forest lands in the State, not just those owned by professional loggers, are to be protected if they otherwise qualify.
As has so often been said by the courts " '[i]t is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld’ ” (Matter of Bernstein v Toia, 43 NY2d 437, 448). It is also well settled that official codes, rules and regulations, when duly filed and published have the force and effect of law. (Matter of Jeffers v Duffy, 52 AD2d 730.)
Petitioners also argue that the City is not empowered to use these watershed lands for forest crop production because the Legislature authorized their acquisition to protect its water supply and, second, for general lack of power. As to the first argument, the statutes authorizing the acquisition of *30 these lands over 100 years ago, do not stipulate that water protection and supply shall be the only use to which they might be put. In fact, the time may come if not granted tax relief, when the City may find it more economical to sell them and construct a filtration plant. As to the second argument of general lack of power, subdivision 2 of section 20 of the General City Law empowers a city: "To take, purchase, hold and lease real and personal property within and without the limits of the city;” and section 19 of the General City Law provides: "Every city is granted power to regulate, manage and control its property and affairs and is granted all the rights, privileges and jurisdiction necessary and proper for carrying such power into execution. No enumeration of powers in this or any other law shall operate to restrict the meaning of this general grant of power, or to exclude other powers comprehended within this general grant.”
There remains, then, one final question for decision.
Does the phrase "exclusively devoted to and suitable for forest crop production” (emphasis supplied) as set forth in section 480-a (subd 1, par [b]) of the Real Property Tax Law bar the City’s watershed forest land from eligibility? As stated earlier, the adverb "exclusively” was added to the final draft of this statute for the first time and also, for the first time, provision was made for a forest management plan acceptable to DEC and, most significantly, the requirement that the plan "shall also specify any use of the tract other than forest crop production which would be permitted as being compatible with and supportive of such production and shall contain requirements and standards for the conduct or establishment of any such use to assure such compatibility and support.” (Real Property Tax Law, § 480-a, subd 2.)
This is an express qualification of the adverb "exclusively” not found in any tax exemption statute embodied within article 4 of the Real Property Tax Law. It makes it unnecessary for the courts to equate "exclusively” with "primarily” as they did in construing section 421 of the Real Property Tax Law granting tax exemption to certain religious and similar charitable corporations (Crusade for Christ v Town of New Lebanon, 36 AD2d 247, affd 31 NY2d 765; Gospel Volunteers v Village of Speculator, 33 AD2d 407, affd 29 NY2d 622).
This reference to approved compatible and supportive other uses, also conclusively differentiates this statute from the one *31 referred to in the Canadice reply brief (City of East Orange v Township of Livingston, 102 NJ Super 512).
The compatibility with and mutual supportiveness of the upland water supply use and the forest crop production are described in logical and persuasive detail in item K of the management plan as well as the opposing affidavits of Carl P. Wiedmann, sworn to October 16, 1978, and the affidavits of Robert F. Windsor and Peter J. Bush, both sworn to on October 17, 1978.
Considering the legislative intention to protect and preserve as many of New York State’s forests as possible, the City’s watershed forest lands are eligible for certification.
The department’s certifications of eligibility did not violate lawful procedure, were not tainted by errors of law, had a rational basis and were neither arbitrary, capricious nor an abuse of discretion.
Having disposed of the CPLR article 78 proceedings, it logically and necessarily follows that the City is entitled to partial exemptions and a correction of the five assessment rolls for the current tax year as provided by section 480-a of the Real Property Tax Law. This should be only a matter of arithmetic. It is suggested that the City and the concerned assessors agree on appropriate orders. If they cannot agree, on request of any of such parties, the court will consider the appointment of referees to hear and report as to the correct assessments and partial exemptions, pursuant to section 720 of the Real Property Tax Law.