OPINION OF THE COURT
Paul G. Feinman, J.
Plaintiffs, Philip Caprio and Phyllis Caprio, commenced this action seeking a judgment declaring certain provisions of the New York Tax Law invalid as applied to them; they also seek injunctive relief enjoining the enforcement of those provisions against them. Defendants, the New York State Department of Taxation and Finance; Thomas H. Mattox, in his official capacity as Commissioner of the New York State Department of Taxation and Finance; the Bureau of Conciliation and Mediation Services; the State of New York and Andrew M. Cuomo, in his official capacity as the governor of the State of New York, move for summary judgment dismissing the complaint. Plaintiffs oppose defendants’ motion and cross-move for summary judgment and any further relief as the court may deem just and proper, including reasonable attorneys’ fees as part of plaintiffs’ costs pursuant to 42 USC § 1988 (b). Defendants oppose plaintiffs’ cross motion.
The principal question to be answered on this motion is whether certain provisions of section 632 (a) (2) of the Tax Law, as amended in August 2010, violate the Due Process Clauses of the United States and New York State Constitutions as applied to plaintiffs. Specifically, plaintiffs challenge the purported retroactive application of the 2010 amendment to section 632 (a) (2) by the Department of Taxation and Finance in assessing ad *967 ditional taxes on plaintiffs for the 2007 and 2008 taxable years. For the reasons stated below, the court concludes that the challenged portions of the amended section 632 (a) (2) are not unconstitutional as applied to plaintiffs. Accordingly, defendants’ motion for summary judgment dismissing the complaint is granted and plaintiffs’ cross motion for summary judgment and attorneys’ fees is denied.
Background
1. Plaintiffs’ Disposition of Their TMC Interests
Prior to 2007, plaintiffs, Philip and Phyllis Caprio, were the sole shareholders[1] of Tri-Maintenance & Contractors, Inc., doing business as TMC Services, Inc., a corporation which had elected S corporation[2] status for federal and New York tax purposes for the last 10 years. During the relevant time period, plaintiffs were not residents of New York, although TMC did derive a portion of its income from activities in New York. Although plaintiffs represented to the Department of Taxation and Finance in at least one document that TMC was organized under the laws of the State of New York (doc 17-7, exhibit G, May 3, 2011 statement of facts), the complaint alleges that TMC was organized under the laws of New Jersey and had elected to be taxed as a corporation under subchapter S of the Internal Revenue Code (26 USC) (doc 15-1, exhibit A, verified complaint H 15).
According to the verified complaint, plaintiffs entered into a “stock purchase agreement” with Sanitors Services, Inc. dated February 1, 2007. Under the agreement, plaintiffs sold all of their respective shares in TMC to Sanitors for an aggregate selling price consisting of a base purchase price of $19,962,080, subject to certain possible adjustments (base purchase price), plus a contingent purchase price based on TMC’s financial performance for the fiscal years ending December 31, 2007, 2008 and 2009 (earnout obligation) (doc 15-1, exhibit A, verified complaint 1115). Sanitors agreed to pay the base purchase price *968 on March 1, 2007, in an aggregate amount equal to $19,462,080, pursuant to separate promissory notes payable to each plaintiff in proportion to their respective stock ownership with interest at the rate of 3.45%. The remaining $500,000 of the base purchase price was to be paid pursuant to separate promissory notes on February 1, 2008, with 4.45% interest. These promissory notes are collectively referred to as the “Sanitors installment obligations.”
2. TMC’s 2007 Federal Taxes
The federal tax treatment given to the TMC transaction is described in the verified complaint. Pursuant to the stock purchase agreement, plaintiffs and Sanitors jointly made an election under section 338 (h) (10) of the Internal Revenue Code by filing a Form 8023. As a result of the section 338 (h) (10) election, for federal tax purposes, the transaction was not treated as a simple sale of all TMC stock by plaintiffs to Sanitors. Rather, section 338 (h) (10) creates a fiction wherein TMC is deemed to have first sold all of its assets, subject to all of its liabilities, to Sanitors as of the close of the acquisition date in exchange for the Sanitors installment obligations. Next, TMC is deemed to have made a distribution to its shareholders (plaintiffs) in a deemed liquidation consisting of the same consideration that TMC was deemed to have received in the deemed asset sale (the Sanitors installment obligations). The deemed liquidation is treated as if it had occurred as of the close of the acquisition date, but immediately after the deemed asset sale. Thus, as a result of the section 338 (h) (10) election, for federal tax purposes, there was not a sale of TMC stock by plaintiffs directly to Sanitors in exchange for the Sanitors installment obligations, but a two-part, fictional transaction in which TMC sold its assets to Sanitors in exchange for the Sanitors installment obligations, followed by a deemed liquidation in which the consideration received from Sanitors by TMC was distributed to plaintiffs.
In addition to the section 338 (h) (10) election, plaintiffs made another election in reporting their federal taxes that is relevant here. Plaintiffs elected to use the installment method of accounting pursuant to Internal Revenue Code § 453 to report the gain from the deemed asset sale (doc 15-1, exhibit A, verified complaint 1Í 25). Under the installment method, the gain is recognized only when cash payments are actually received. Thus, the gain from the receipt of promissory notes from Sanitors would only be recognized when cash payments were actu *969 ally made pursuant to those notes. “TMC filed a final federal Form 1120S for a short taxable year ending on February 1, 2007 . . . [and] reported the Deemed Asset Sale in the same manner as if TMC had actually sold its assets to Sanitors” (id. 1Í 24). The “short taxable year” ended on the acquisition date for the subject transaction. Since neither TMC nor plaintiffs had received any cash payments from Sanitors by that date, the deemed asset sale “did not result in TMC’s recognition of any gain under the installment method on TMC’s Federal Stub Return” {id. 1i 27). Plaintiffs claim that under section 453B (h) of the Internal Revenue Code, TMC did not recognize any gain by reason of the deemed liquidation of the Sanitors installment obligations to plaintiffs in exchange for their stock.
3. Plaintiffs’ Personal 2007 and 2008 Federal Taxes
Plaintiffs claim that they did not recognize any gain upon their receipt of the Sanitors installment obligations as of the close of the acquisition date because, under Internal Revenue Code § 453 (h) (1) (A), only cash payments actually received under the installment obligations — as opposed to the receipt of the obligations themselves — are treated as payment received in exchange for plaintiffs’ stock in TMC. Plaintiffs also claim that, pursuant to Internal Revenue Code § 453 (h) (1) (A), they reported an installment sale of their TMC stock on Form 6252 attached to their 2007 Form 1040. There, they recognized capital gain in 2007 in the aggregate amount of $18,263,325, which was attributable to plaintiffs’ receipt of the initial payments of principal under the promissory notes from Sanitors after those notes had been distributed by TMC to plaintiffs in the deemed liquidation.
It should be noted that because the stock purchase agreement provided that Sanitors would make the first payment in an aggregate amount equal to $19,462,080, plus 3.45% on March 1, 2007, and TMC’s 2007 “Federal Stub Return” only covered through February 1, 2007, plaintiffs’ election of the installment method of accounting explains why plaintiffs’ individual tax returns for 2007, which covered the entire year and not just up until February 1, would reflect the distribution received by plaintiffs from the deemed liquidation while TMC’s “Federal Stub Return” would not.
The next year, plaintiffs reported additional gain from the TMC transaction in an aggregate amount of $1,139,061 on Form 6252 attached to their 2008 Federal Form 1040, which was attributable to the second cash payments received under the *970 promissory notes from Sanitors, plus the first payment made by Sanitors pursuant to the Sanitors earnout obligation.
4. TMC’s 2007 New York Taxes
According to plaintiffs, TMC filed a final New York S corporation return using Form CT-3-S for a short taxable year ending February 1, 2007, in which they claim TMC reported the gain from the deemed asset sale under the installment method “consistent with the approach used on TMC’s Federal Stub Return” (doc 15-1, exhibit A, verified complaint U 34). For the same reasons described above in connection with TMC’s “Federal Stub Return,” TMC did not recognize any gain from the deemed asset sale or the deemed liquidation of the Sanitors installment obligations. TMC issued a “New York Shareholder Summary” reflecting plaintiffs’ individual shares of operating income for the shortened taxable year or “stub period.” This summary “did not show any gain with respect to the Deemed Asset Sale, except for a relatively small amount of ‘recapture’ income not eligible for the installment method” {id. 1i 35).
5. Plaintiffs’ 2007 and 2008 New York Taxes
Plaintiffs’ 2007 and 2008 New York nonresident income tax returns (Form IT-203) reported their receipt of payments from Sanitors “exactly as those payments were reported on their federal returns — i.e., as payments received under the installment method in exchange for [plaintiffs’] stock in TMC” (doc 15-1, exhibit A, verified complaint 1i 38). Claiming that the gain recognized by plaintiffs upon their receipt of payments under the Sanitors installment obligations was treated for federal purposes as gain from the sale of stock, plaintiffs argue that the gain did not constitute New York-source income and was not subject to New York tax because, under Tax Law § 631 (b) (2) and 20 NYCRR 132.8 (c), gain from the sale of an intangible asset, including stock, is not taxable to a nonresident individual unless the gain is from property employed in a trade or business carried on in New York.
6. The Mintz Determination
In 2009, an administrative law judge of the Division of Tax Appeals issued a determination involving what plaintiffs describe as a transaction identical to their disposition of their TMC stock. According to plaintiffs, in Matter of Mintz (NY St Div of Tax Appeals DTA Nos. 821807, 821806 [June 4, 2009]), the administrative law judge determined that in a transaction subject to section 453 (h) (1) (A) of the Internal Revenue Code, “nonresident shareholders of an S corporation did not have *971 New York-source income upon their receipt of payments under an installment obligation distributed by the S corporation” (doc 15-1, exhibit A, verified complaint 1i 40; doc 20-14, exhibit N, Mintz at 5). The verified complaint quotes a passage from Mintz stating, “since the gain petitioners received (via periodic installment payments) in exchange for their stock in [the S Corporation] was gain from the sale of stock held by a nonresident, the same is not includible as New York source income [and] is not subject to taxation by New York State” (id.). Plaintiffs argue that the determination set forth in Mintz “clearly shows that [plaintiffs] properly reported their 2007 sale of TMC stock for New York personal income tax purposes” (id.).
7. Amendment to Tax Law § 632 (a) (2)
Partially as a response to Mintz, in August of 2010, section 632 (a) (2) of the Tax Law was amended by the legislature in what plaintiffs characterize as a “fundamental change in the application of the installment method to transactions in which an installment obligation is distributed to a nonresident shareholder of an S Corporation pursuant to Section 453 (h) (1) (A) of the [Internal Revenue] Code” (id. 1Í 42). Specifically, they claim that the 2010 amendment “added a provision that now treats the gain to a nonresident shareholder of an S Corporation, with respect to payments received under the installment obligation, as New York-source income based on the corporation’s business allocation percentage for the corporation’s taxable year in which the assets were sold” (id.).
Prior to August of 2010, section 632 (a) (2) of the Tax Law read as follows:
“In determining New York source income of a nonresident shareholder of an S corporation where the election provided for in subsection (a) of section six hundred sixty of this article is in effect, there shall be included only the portion derived from or connected with New York sources of such shareholder’s pro rata share of items of S corporation income, loss and deduction entering into his federal adjusted gross income, increased by reductions for taxes described in paragraphs two and three of subsection (f) of section thirteen hundred sixty-six of the internal revenue code, as such portion shall be determined under regulations of the commissioner consistent with the applicable methods and rules for allocation under article nine-A or thirty-two of this chapter.”
*972 The August 2010 amendment added:
“regardless of whether or not such item or reduction is included in entire net income under article nine-A or thirty-two for the tax year. If a nonresident is a shareholder in an S corporation where the election provided for in subsection (a) of section six hundred sixty of this article is in effect, and the S corporation has distributed an installment obligation under section 453(h)(1)(A) of the Internal Revenue Code, then any gain recognized on the receipt of payments from the installment obligation for federal income tax purposes will be treated as New York source income allocated in a manner consistent with the applicable methods and rules for allocation under article nine-A or thirty-two of this chapter in the year that the assets were sold. In addition, if the shareholders of the S corporation have made an election under section 338(h)(10) of the Internal Revenue Code, then any gain recognized on the deemed asset sale for federal income tax purposes will be treated as New York source income allocated in a manner consistent with the applicable methods and rules for allocation under article nine-A or thirty-two of this chapter in the year that the shareholder made the section 338(h)(10) election. For purposes of a section 338(h) (10) election, when a nonresident shareholder exchanges his or her S corporation stock as part of the deemed liquidation, any gain or loss recognized shall be treated as the disposition of an intangible asset and will not increase or offset any gain recognized on the deemed assets sale as a result of the section 338(h)(10) election.” (L 2010, ch 57, part C, § 2.)
The text of the 2010 amendment as initially proposed by the governor had provided that the amendment to Tax Law § 632 (a) (2) would apply to “all tax years for which the statute of limitations for seeking a refund or assessing additional tax are still open” (L 2010, ch 57, part C, § 4, quoted in doc 16, defendants’ mem of law at 6). This was later changed to limit the applicability of that section to “taxable years beginning on or after January 1, 2007 for which the statute of limitations for seeking a refund or assessing additional tax is still open,” except in cases of fraud, substantial omission of income or where there has been a failure to file (L 2010, ch 312, part B, § 1, quoted in doc 16, defendants’ mem of law at 6). The legislative findings accompanying the amendment stated:
*973 “it is necessary to correct a decision of the tax appeals tribunal and a determination of the division of tax appeals that erroneously overturned the longstanding policies of department of taxation and finance that nonresident subchapter S shareholders who sell their interest in an S corporation pursuant to an election under section 338(h)(10) or section 453(h)(1)(A) of the Internal Revenue Code, respectively, are taxed in accordance with that election and the transaction is treated as an asset sale producing New York source income. Section two of this act is intended to clarify the concept of federal conformity in the personal income tax and is necessary to prevent confusion in the preparation of returns, unintended refunds, and protracted litigation of issues that have been properly administered up to now” (L 2010, ch 57, part C, § 1).
The “determination of the division of tax appeals” referenced in the legislative findings was Matter of Mintz.
8. February 2011 Notice of Deficiency
On February 7, 2011, defendant Department of Taxation and Finance issued a notice of deficiency to plaintiffs pertaining to their 2007 and 2008 income tax returns and assessed additional taxes and interest thereon in the total amount of $744,039, which was due February 28, 2011. $139,461 of the amount assessed consisted of interest. The notice indicates that plaintiffs could dispute the amount due by filing a request for conciliation conference with defendants or a petition for a tax appeals hearing by May 8, 2011. According to plaintiffs, the additional taxes and interest assessed in the February 7, 2011 notice were attributable to defendants’ retroactive application of the 2010 amendment to Tax Law § 632 (a) (2). Defendants’ answer contained a denial as to this allegation, but it was not reiterated in connection with the instant motion and cross motion.
9. Commencement of This Action and Request for Conciliation Conference
Plaintiffs commenced the instant action by electronically filing the summons and verified complaint on May 2, 2011. The next day, they sent a request for conciliation conference to the Bureau of Conciliation and Mediation Services, attaching a “Statement of Facts.” This statement largely mirrors the allegations found in the complaint with a few exceptions. One notable difference is that the complaint alleges that TMC is a New Jersey corporation, while the statement claims TMC was a *974 corporation organized under the laws of the State of New York (doc 17-7, exhibit G, statement of facts).
The complaint seeks a declaration that the 2010 amendment to section 632 (a) (2) of the Tax Law, to the extent defendants have applied it to retroactively impose taxes on gain recognized on payments received from installment obligations distributed under Internal Revenue Code § 453 (h) (1) (A), is unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of the New York Constitution as applied to plaintiffs (doc 15-1, exhibit A, verified complaint 1i 51). Plaintiffs further seek a judgment declaring the February 7, 2011 notice of deficiency void and of no effect (id.). In addition, plaintiffs request an injunction enjoining defendants from taking any actions against plaintiffs to enforce the 2010 amendment to Tax Law § 632 (a) (2), including any proceedings pursuant to any request for conciliation conference or petition for a tax appeals hearing filed by plaintiffs (id. 1Í 53). In the papers filed by plaintiffs in connection with the instant motion and cross motion, they clarify that they only challenge the retroactive application of the portion of section 632 (a) (2) pertaining to the tax treatment of installment obligations under section 453 (h) (1) (A) of the Internal Revenue Code, and “do not challenge those portions of the 2010 Amendments relating to 26 USC § 338 (h) (10)” (doc 22, plaintiffs’ opp mem at 27).
Analysis
1. General Standard on Motion for Summary Judgment
The proponent of a summary judgment motion is required to make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (see Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). Upon such a showing, the burden shifts to the party opposing summary judgment to produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which it rests, or must demonstrate an acceptable excuse for its inability to do so (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).
2. Failure to Exhaust Administrative Remedies
Defendants initially argued that the action should be dismissed without prejudice so that a factual record could be fully developed through the administrative procedures available for reviewing tax determinations. However, at oral argument, *975 the parties each made it clear that they viewed the only outstanding issues as involving pure matters of law that can be decided without the necessity of developing a more detailed factual record. As such, the court will review the merits of the parties’ respective summary judgment motions (see Amazon.com, LLC v New York State Dept. of Taxation & Fin., 81 AD3d 183, 203 [1st Dept 2010], citing Matter of First Natl. City Bank v City of N.Y. Fin. Admin., 36 NY2d 87, 92 [1975] [“When a tax statute ... is alleged to be unconstitutional, by its terms or application, or where the statute is attacked as wholly inapplicable, it may be challenged in judicial proceedings other than those prescribed by the statute as exclusive” (internal quotation marks omitted)]). Plaintiffs are not obligated to exhaust their administrative remedies since they are not challenging the amount of the tax assessment, but the tax statute’s constitutionality and applicability (see Empire State Bldg. Co. v New York State Dept. of Taxation & Fin., 185 AD2d 201 [1st Dept 1992] [citing Tully v Griffin, Inc., 429 US 68, 75 (1976)], affd 81 NY2d 1002 [1993]).
3. Nature of Plaintiffs’ Claims
Plaintiffs do not challenge the validity of all aspects of the 2010 amendment to Tax Law § 632 (a) (2), and concede that the prospective application of the statute could not be contested. Rather, plaintiffs only challenge the portion of the revised statute which purports to make the August 2010 amendment retroactive to “taxable years beginning on or after January 1, 2007, for which the statute of limitations for seeking a refund or assessing additional tax are still open” (doc 21-1, exhibit A, verified complaint 1f 43). More particularly, plaintiffs challenge the constitutionality of the retroactive application of amended Tax Law § 632 (a) (2) as it has been applied against them, claiming that the notice of deficiency issued on February 7, 2011 was “attributable entirely” to defendants’ application of the 2010 amendment to section 632 (a) (2) (id. H 47). Defendants’ answer denied the allegation asserted in plaintiffs’ complaint that the notice of deficiency was “attributable entirely” to defendants’ application of the amended statute (doc 15-2, exhibit B, answer 1130).
The verified complaint challenges the retroactive application of the 2010 amendment to Tax Law § 632 (a) (2) as a deprivation of plaintiffs’ “property rights without due process of law, in violation of Section 1 of Amendment XIV to the United States Constitution and Section 6 of Article I of the New York Consti *976 tution” (doc 21-1, exhibit A, verified complaint 1149). Plaintiffs argue that the 2010 amendment imposed
“a tax for the first time on the gain recognized on payments received from installment obligations distributed under Section 453 (h) (1) (A) of the Code, and . . . provide[d] an excessive period of retroactivity of three and one-half years as applied to [plaintiffs], thereby creating a hard and oppressive effect on the settled expectations of’ plaintiffs (id. 1i 50).
Plaintiffs make no specific distinction between their claims under the United States and New York Constitutions, and they cite federal and state cases interchangeably throughout their papers.
4. General Due Process Standards Applicable to Retroactive Tax Statutes
It is well established that legislation “carries a presumption of constitutionality” and “plaintiffs bear the burden of demonstrating beyond a reasonable doubt that it is unconstitutional” (Alliance of Am. Insurers v Chu, 77 NY2d 573, 585 [1991]). The 14th Amendment of the United States Constitution provides, in relevant part, that “[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . .” Similarly, section 6 of article I of the New York Constitution includes the statement that “[n]o person shall be deprived of life, liberty or property without due process of law.” In the context of a due process challenge to the retroactive application of a tax amendment, New York courts make no distinction between the Federal and State Due Process Clauses.
“Retroactive tax legislation may be treated as valid, unless it reaches so far into the past or so unfairly as to constitute a deprivation of property without due process” (Matter of Varrington v City of N.Y. Dept. of Fin., 85 NY2d 28, 32-34 [1995], citing Matter of Lacidem Realty Corp. v Graves, 288 NY 354 [1942]; United States v Hemme, 476 US 558 [1986]; United States v Darusmont, 449 US 292 [1981]; Welch v Henry, 305 US 134 [1938]). The retroactive application of a tax statute will “ordinarily [be] upheld against due process challenges, unless in light of ‘the nature of the tax and the circumstances in which it is laid,’ the retroactivity of the law is ‘so harsh and oppressive as to transgress the constitutional limitation’ ” (Matter of Replan Dev. v Department of Hous. Preserv. & Dev. of City of N.Y., 70 NY2d 451, 455 [1987], quoting Welch, 305 US at 147). “Whether the retroactive application of a tax statute is ‘harsh and oppres *977 sive’ is a ‘question of degree’ (People ex rel. Beck v Graves, 280 NY 405, 409, supra), requiring a ‘balancing of [the] equities’ ” (Matter of Replan Dev., 70 NY2d at 456, quoting Holly S. Clarendon Trust v State Tax Commn., 43 NY2d 933, 934 [1978]). The Supreme Court has noted that the “harsh and oppressive” formulation “does not differ from the prohibition against arbitrary and irrational legislation that applies generally to enactments in the sphere of economic policy” (United States v Carlton, 512 US 26, 30 [1994] [internal quotation marks omitted], quoting Pension Benefit Guaranty Corporation v R. A. Gray & Co., 467 US 717, 733 [1984]).
Retroactivity is permitted in the area of taxation because “[t]axation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens” (Varrington, 85 NY2d at 33-34, quoting Welch, 305 US at 146). Thus, “[s]ince no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process, and to challenge the present tax it is not enough to point out that the taxable event, the receipt of income, antedated the statute” (id. [applying this reasoning to uphold a tax imposed on foreign corporate limited partners], quoting Welch, 305 US at 147). The general approach taken in prior cases, both federal and New York, requires the court to “consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation” (Welch, 305 US at 147; see also United States v Hemme, 476 US 558, 569 [1986]; United States v Carlton, 512 US 26 [1994]; Matter of Replan Dev., 70 NY2d at 455).
5. Nature of the Tax at Issue
As an initial matter, the parties here offer conflicting views of the “nature of the tax and the circumstances in which it [was] laid” (Welch, 305 US at 147). Relevant to this analysis, the Supreme Court has drawn a distinction between retroactive statutes involving “the creation of a wholly new tax” and “amendments that bring about certain changes in operation of the tax laws” (Hemme, 476 US at 568). The gift tax involved in Untermyer v Anderson (276 US 440 [1928]) is commonly cited as a prototypical case of a “wholly new tax,” since the retroactive provision at issue was “the Nation’s first gift tax” (Carlton, 512 US at 34). A tax may be viewed as a “wholly new tax” only *978 in those circumstances where the taxpayer “has no reason to suppose that any transactions of the sort will be taxed at all” (United States v Darusmont, 449 US 292, 300 [1981] [internal quotation marks omitted]). A statute that creates a wholly new tax while imposing retroactive application that is not limited to a short period may run afoul of due process (see Matter of Varrington Corp. v City of N.Y. Dept. of Fin., 85 NY2d 28, 33 [1995] [approving tax made retroactive for a short period where the evidence supported that the regulation at issue reflected the long-established policy of the City to apply the general corporate tax to foreign corporate limited partners, notwithstanding some recent indication that the City had adopted a different approach]). In contrast, a retroactive tax statute that is “curative” or “clarifying” in nature is less likely to fall victim to a due process challenge (see Carlton, 512 US at 31 [amendment at issue was adopted as a curative measure]). This includes statutory amendments “that bring about certain changes in operation of the tax laws” (Hemme, 476 US at 568).
According to plaintiffs, the 2010 amendment to Tax Law § 632 (a) (2) created a “new tax” because “for the first time [the amendment] imposed a New York State tax obligation on installment transactions on the sale of stock by nonresidents under Section 453 (h) (1) (A) of the Code” (doc 22, plaintiffs’ opp mem at 19). In their initial motion papers, plaintiffs argued that certain facts lead to the conclusion that defendants “effectively concede that the 2010 [a]mendments imposed a new tax”: (1) the Department of Taxation and Finance recommended that the 2010 amendment be enacted, in part, to override the Division of Tax Appeals’ determination in Mintz-, and (2) the amendment “w[as] designed to ‘increase revenue by $30 million in SFY 2010-11 and $12 million per year thereafter’ ” (id. at 20, quoting doc 15-4, exhibit D, 2010-2011 NY St Exec Budget Revenue Article VII Legis Mem in Support); and (3) the statement made in the affidavit of Kristin Dence, an employee of the Department of Taxation and Finance, that the Department was required to abandon proposed assessments and agree to certain refunds as a result of the legislature’s modification of the retroactivity period in the 2010 amendment (id. at 20).
Defendants contend that the 2010 amendment did not create a “new tax” but was simply a “curative or clarifying measure! ]” intended to correct the erroneous determinations of the administrative law judge in Mintz and the Tax Appeals Tribunal in Matter of Baum (NY St Tax Appeals Trib, DTA Nos. 820837, *979 820838 [Feb. 12, 2009]; doc 16, defendants’ mem at 21). In support, defendants refer to Kristin Dence’s affidavit and the exhibits annexed thereto as evidence that Mintz and Baum represented a departure from the long-standing position and practice of the Department of Taxation and Finance with respect to the sale of a nonresident’s stock in an S corporation and federal conformity (doc 17, Dence aff 1i 1). Dence claims that the 2010 amendment was not intended to change the existing tax law or practice, but rather to clarify and ratify what the Department of Taxation and Finance had long believed was already clear in the existing statutes (id. 1Í 3). Defendants contend that legislative action was necessary because the administrative procedure set out in the Tax Law did not authorize the Department of Taxation and Finance to appeal or otherwise formally challenge the determinations made in Mintz or Baum.
In contrast to their initial motion papers, plaintiffs’ reply omits any reference to the administrative law judge’s determination in Mintz (doc 28, plaintiffs’ reply mem). Rather, plaintiffs’ main argument is that “all of defendants’ authorities [as cited in their reply papers] are inapposite because they either concern truly ‘curative acts’ or do not otherwise concern the retroactive imposition of a new tax” (id. at 6-10). Plaintiffs’ moving and reply papers both place a significant amount of weight on a 2010 decision of the Supreme Court of Iowa, Zaber v City of Dubuque (789 NW2d 634 [Iowa 2010]). In particular, plaintiffs adopt Zaber’s analysis on the issue of whether an act is “curative” for purposes of retroactivity, which states that “[a] curative act is a statute passed to cure defects in prior law, or to validate legal proceedings, instruments, or acts of public or private administrative authorities. In the absence of such an act the statute would be void for want of conformity with existing legal requirements” (id. at 644 [emphasis omitted], quoting 2 Norman J. Singer et al., Sutherland Statutes and Statutory Construction § 41:11 [7th ed 2007]). The Iowa Supreme Court also claimed that the statute at issue in Carlton, which the Supreme Court described as having been “adopted as a curative measure” (512 US at 31), actually “was not a curative act” because “there was no defect in the original statute that would render it void” (Zaber, 789 NW2d at 643-644). Based on the definition of a “curative act” set out in Zaber, plaintiffs argue that the amendment at issue here was not a “curative act” that would justify a longer period of retroactivity based on several observations: (1) defendants do not contend that Tax Law § 632 *980 (a) (2) would have been void absent the 2010 amendment; (2) the 2010 amendment was designed to ensure that tax collections increased in the future and was not designed to avoid the refund of monies already collected and spent; and (3) plaintiffs had conducted themselves in accordance with the laws in effect at the time of the 2007 TMC transaction, which they claim did not impose a tax (doc 22, plaintiffs’ mem at 22).
In determining whether the August 2010 amendment to Tax Law § 632 (a) (2) should be viewed as enacting a “wholly new tax,” the court looks to the legislative findings and legislative history surrounding the amendment’s passing. The legislature included express legislative findings in enacting the amendment, which indicate that the additional language was “necessary to correct a decision of the tax appeals tribunal [(Mintz)] and a determination of the division of tax appeals [(Baum)] that erroneously overturned the longstanding policies of [the] department of taxation and finance” (L 2010, ch 57, part C, § 1). The amendment was further “intended to clarify the concept of federal conformity in the personal income tax and is necessary to prevent confusion in the preparation of returns, unintended refunds, and protracted litigation of issues that have been properly administered up to now” (id,.). Other materials in the legislative history also emphasize that Mintz and Baum represented departures from the long-standing position of the Department of Taxation and Finance and thus would cause uncertainty for purchasers where an election under Internal Revenue Code § 338 (h) (10) had been made (doc 15-4, exhibit D, Governor’s Mem in Support at 12-13).
Plaintiffs offer no evidence to call into question defendants’ claim that the legislative history described above is a reliable description of the “nature of the tax and the circumstances in which it [was] laid” (Replan Dev., 70 NY2d at 455, quoting Welch, 305 US at 147). Instead, plaintiffs’ contention that the August 2010 amendment involved a “wholly new tax” is based on the narrow definition of “curative act” set forth in Zaber (789 NW2d at 643-644). However, Zaber, by its own account, did not involve “the collection of taxes that government for constitutional reasons lacks the power to impose . . . , but instead involves local taxes that [only] the state has the power to authorize” (id. at 639). The “fundamental issue presented [was] whether the state as principal could exercise its power to ratify the unauthorized, but otherwise constitutional, acts of its political subdivisions” (id.). Moreover, the case primarily turned *981 on the application of “substantive due process” standards arising almost exclusively out of Iowa case law (id. at 640). Thus, not only is the decision in Zaber not binding authority on this court, it bears only the slightest weight as persuasive authority.
The text of the amendment itself provides additional support for defendants’ contention that the statute does not create a “wholly new tax” as that term has been used by the Supreme Court in this context. The amendment inserts additional lines of text into an existing statute. The new text provides specific examples of the general matters set out in the existing first part of the statute. Viewed in conjunction with the legislative history and its conformity with undisputed long-standing policies of the Department of Taxation and Finance, defendants have sufficiently shown that the 2010 amendment of Tax Law § 632 (a) (2) did not involve the “creation of a wholly new tax” (Carlton, 512 US at 34).
6. Retroactive Application of 2010 Amendment
As noted above, the “harsh and oppressive” due process standard often applied in constitutional challenges to tax statutes with retroactive effects “does not differ from the prohibition against arbitrary and irrational legislation that applies generally to enactments in the sphere of economic policy” (Carlton, 512 US at 30).
“The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former .... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose” (id. at 31, quoting Pension Benefit Guaranty Corporation v R. A. Gray & Co., 467 US 717, 730 [1984]; see also Replan Dev., 70 NY2d at 456 [the “public purpose for retroactive application is important”]; see also Clarendon Trust, 43 NY2d at 935 [retroactivity deemed too harsh in absence of a valid public purpose]).
The legislative findings accompanying the August 2010 amendment to Tax Law § 632 (a) (2) indicate that the additional provision was intended to clarify the existing statute and to correct what were viewed as erroneous determinations in Mintz and Baum (L 2010, ch 57, part C, § 1). The retroactivity period provided by the amendment makes the statute applicable to taxable years beginning on or after January 1, 2007, for which *982 the statute of limitations for seeking a refund or assessing additional tax is still open, or in cases of failure to file or fraud, the amendment would apply to all taxable years as long as the statute of limitations remained open and subject to assessment. The time period thus is geared toward facilitating enforcement of the statute in connection with any outstanding matter. It is rationally related to the legislative goals of providing clarity and preventing confusion by making it clear that a taxpayer could not rely on Mintz or Baum, which the legislature apparently viewed as erroneous in that they overturned the long-standing policies of the Department of Taxation and Finance. A taxpayer would reasonably expect that so long as the statute of limitations period remained open for the relevant taxable year, the Department of Taxation and Finance could impose an additional assessment and the taxpayer would not have “secure[d] repose from the taxation of transactions” at issue (Replan Dev., 70 NY2d at 456, quoting Matter of Neuner v Weyant, 63 AD2d 290, 302 [1978]).
Plaintiffs argue that “the Supreme Court has adopted a general rule that any retroactive tax legislation may extend only to transactions ‘during the year of the legislation session preceding that of its enactment’ ” (doc 22, plaintiffs’ mem at 16, quoting Welch, 305 US at 150), and claim that New York courts have invalidated tax statutes on due process grounds when the period of retroactivity exceeds a year (id.). Contrary to plaintiffs’ contention, both federal and New York cases have eschewed the adoption of rigid rules for determining whether the duration of the retroactive period of a tax is unconstitutional (see Matter of Replan Dev., 70 NY2d at 456), and have approved retroactivity periods longer than one year in the appropriate circumstances (see e.g. Welch, 305 US 134 [1938] [two-year retrospective period upheld]; Varrington, 85 NY2d at 31-32 [in 1990, City recovered refund issued in 1988 based on 1984 through 1986 tax years]).
Accordingly, since the retroactive aspect of the August 2010 amendment to Tax Law § 632 (a) (2) is justified by the rational legislative purposes furthered by the substantive provisions of the amendment, the retroactive application of the statute does not necessarily offend the requirements of due process.
7. Plaintiffs’ Reliance on the Pre-2010 Amendment Statute
Determining whether the retroactive application of a tax statute is “harsh and oppressive” requires the court to consider the “taxpayer’s forewarning of a change in the legislation and the *983 reasonableness of his [or her] reliance on the old law” (Matter of Replan Dev., 70 NY2d at 456 [describing this as perhaps the “predominant” factor], citing Matter of Chrysler Props. v Morris, 23 NY2d 515, 521 [1969]; Matter of Neuner, 63 AD2d at 300). However, “reliance alone is insufficient to establish a constitutional violation” because “[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code” (Carlton, 512 US at 33; see also Varrington, 85 NY2d at 33 [plaintiff had no vested or actionable right to the benefit of a tax statute or regulation]). In Carlton, the Supreme Court upheld the retroactivity of an amendment to the tax law even though the challenger’s reliance on and reading of the original statute was “uncontested” (512 US at 33). Similarly, the Court did not consider Carlton’s lack of notice of the 1987 amendment to be dispositive, declaring that a taxpayer “should be regarded as taking his chances of any increase in the tax burden which might result from carrying out the established policy of taxation” (id. at 34, quoting Milliken v United States, 283 US 15, 23 [1931], and citing Welch, 305 US at 134). Although New York courts have not gone as far as the Supreme Court in downplaying the role of reliance in the constitutional analysis, the Court of Appeals, even after Carlton, has dismissed a challenge to the constitutionality of the retroactive application of a tax where the taxpayer stated “no cognizable detrimental reliance” (Varrington, 85 NY2d at 35).
Plaintiffs claim that in 2007 they “structured the stock sale at issue in reliance on the New York Tax Law as it was then in effect” (doc 15-1, exhibit A, verified complaint 11 3), and have been “unjustifiably prejudiced by the retroactive application of the 2010 legislation” (id. 1f 4). According to plaintiffs, the relevant New York law in place prior to the 2010 amendment to Tax Law § 632 (a) (2) was set forth in a determination issued June 4, 2009, by an administrative law judge of the Division of Tax Appeals in a matter titled, Matter of Mintz (NY St Div of Tax Appeals DTA Nos. 821807, 821806). Plaintiffs describe Mintz as holding that “nonresident shareholders of an S Corporation did not have New York-source income upon their receipt of payments under an installment obligation distributed by the S Corporation in a transaction subject to Section 453 (h) (1) (A) of the [Federal] Code” (id. It 40), because “the gain petitioners received (via periodic installment payments) in exchange for their stock in [the S corporation] was gain from the sale of stock held by a nonresident, [which] is not includible *984 as New York source income” (id.). Plaintiffs note that defendants “chose not to appeal” the determination in Mintz but instead opted to seek a remedy from the legislative branch, suggesting, in plaintiffs’ view, that the Department of Taxation and Finance knew that the existing law did not impose a tax in these circumstances and, therefore, that plaintiffs reliance on the pre-2010 amendment law was reasonable.
To be sure, plaintiffs could not have reasonably relied on the Mintz determination itself for several reasons. First, pursuant to Tax Law § 2010 (5), “[determinations issued by administrative law judges shall not be cited, shall not be considered as precedent nor be given any force or effect in any other proceedings conducted pursuant to the authority of the division or in any judicial proceedings conducted in this state.” In light of this express and unambiguous statutory prohibition, any reliance on Mintz would not be reasonable. Second, and most importantly, the Mintz determination was not issued until June 4, 2009 — more than two years after the closing of the TMC stock transaction. Thus, plaintiffs could not possibly have structured their transaction in reliance on Mintz's interpretation of the governing law.
To the extent plaintiffs use Mintz solely as evidence of the state of New York Tax Law prior to the 2010 amendment, they have offered no other evidence or cited any case law tending to show that Mintz represented the long-standing tax policy with respect to the taxation of the transaction at issue. Defendants, however, offer undisputed evidence that supports their contention that Mintz was an aberration of the existing New York Tax Law that contradicted the long-established views of the Department of Taxation and Finance. As proof of the Department’s long-established policies, defendants submit a sworn affidavit from Kristin Dence, a certified public accountant employed by the Department since September of 1994, a PowerPoint presentation given to the Department’s new auditors on October 23, 2002,[3] an advisory opinion from the Commissioner of Taxation and Finance from February 6, 1997 (NY St Dept of Taxation & Fin Advisory Op Nos. TSB-A-97[2]I, TSB-A-97[5]C), and a determination issued by the Division of Tax Appeals, dated December 16, 2004, in Matter of Zweig (NY St Div of Tax Ap *985 peals DTA Nos. 819390, 819391, 819392 [Dec. 16, 2004]). While Tax Law § 2010 (5) forecloses attachment of any precedential value to Matter of Zweig, the determination nonetheless provides some proof that in 2004, the Department advanced the view that the gain from a transaction under Internal Revenue Code § 338 (h) (10) would be used by individual S corporation shareholders in calculating their New York adjusted gross income. Moreover, defendants argue that asking the legislature to amend Tax Law § 632 (a) (2) was necessary to foreclose any confusion created by Mintz’s purportedly erroneous interpretation because under the procedure governing tax reviews, the Department had no means to challenge a determination in favor of a taxpayer.
In reply, plaintiffs suggest that even if defendants had a longstanding policy to assess a tax on nonresident shareholders in this type of transaction even prior to the 2010 amendment, defendants were not authorized to make such assessments under New York Tax Law (doc 28, plaintiffs’ reply at 4). At oral argument on the instant motion, plaintiffs’ counsel argued that defendants’ claim that the Department had adopted this policy is tantamount to the Department “saying . . . that they were using unlawful procedures to collect an unauthorized tax” (doc 30, tr at 20).
The circumstances at issue here are analogous to those presented in Varrington (85 NY2d at 31-36). In Varrington, a long-standing New York City tax policy was temporarily altered in 1988, but the City reverted to its original policy in 1990. During the intervening time period, Varrington, expressly relying on the temporary 1988 position, applied for and received a refund of all of the City corporate taxes which it had paid for tax years 1984 through 1986. After the City reversed its temporary position in 1990, it sought to recoup the refund that it paid to Varrington in 1988. Varrington argued that the 1990 rule could only be applied prospectively because it had detrimentally relied on the settled policy of 1988. The Court of Appeals rejected Varrington’s reliance claim as misplaced because it shifted “the analytical focus of this issue to the tax refund rather than, as it should be, on the underlying taxing event which gives rise to the tax liability in the first instance” (id. at 33). The fact that Varrington was required to return the refund did not support its detrimental reliance theory “[s]ince tax legislation is not a governmental promise, Varrington ha[d] no vested or actionable right in these circumstances to the benefit of a tax statute or *986 regulation” (id.). The Court found that until 1988, New York City had a long-standing policy and characterized the temporary change in this policy between 1988 and 1990 as “the blip on the screen.” (Id. at 35.)
Here, defendants have shown, and plaintiffs have not submitted competent proof to the contrary, that the Department had a long-standing policy of taxing the type of transaction at issue and that the administrative determinations made in 2009 were aberrational. Plaintiffs could not have justifiably relied on these 2009 determinations at the time of the underlying taxing event in 2007. Because there “was no cognizable detrimental reliance on the temporarily altered, long-standing tax policy, and since the [2010 amendment] was justifiably applied in relation to the challenged taxing event” (id.), plaintiffs have not been deprived of property without due process.
8. Plaintiffs’ Nonresident Status
The court notes that plaintiffs’ due process challenge is not specifically addressed to the fact that this tax is being applied to a nonresident. In other words, plaintiffs do not invoke the due process analysis applied in Matter of Zelinsky v Tax Appeals Trib. of State of N.Y. (1 NY3d 85 [2003]) or Matter of Huckaby v New York State Div. of Tax Appeals, Tax Appeals Trib. (4 NY3d 427 [2005]). In Matter of Huckaby, the Court of Appeals described due process as a “proxy for notice [which] looks to the connection that must be present between the taxpayer and the taxing state before the state has authority to impose its power to tax” (4 NY3d at 437 [internal quotation marks omitted], cit mg Northwestern States Portland Cement Co. v Minnesota, 358 US 450 [1959]; Quill Corp. v North Dakota, 504 US 298, 313 [1992]). In this context, “[a]ll that is required to satisfy due process is some ‘minimal connection’ between the taxpayer and the state, and that the income the state seeks to tax be ‘rationally related to values connected with’ the state” (id., quoting Moorman Mfg. Co. v Bair, 437 US 267, 273 [1978]). To the extent this aspect of due process is implicated by the allegations asserted in plaintiffs’ complaint, the record shows that there is a sufficient connection between plaintiffs and New York. Plaintiffs were the sole shareholders of TMC, an entity that had elected S corporation status for both federal and New York purposes for the last 10 years. According to TMC’s 2007 New York S Corporation Franchise Tax Return, Attachment to Form CT-3-S, TMC’s “[r]eceipts in the regular course of business” included $3,517,473 in “[s]ales of New York State tangible *987 personal property” (doc 20-10, exhibit J, Attachment to Form CT-3-S). TMC’s total “[r]eceipts in the regular course of business,” including both New York and non-New York receipts, was $7,216,676, meaning 48.7409% of TMC’s business involved “[s jales of New York State tangible personal property.” In light of these figures, a rational relation exists between the tax defendants have assessed under the newly amended Tax Law § 632 (a) (2) and TMC and plaintiffs’ activities within New York.
9. Summary of Due Process Analysis
Plaintiffs have failed to meet their substantial burden of establishing that the retroactive application of the 2010 amendment to Tax Law § 632 (a) (2) by defendants is “so harsh and oppressive as to transgress the constitutional limitation” of due process (see Carlton, 512 US at 30, quoting Welch, 305 US at 147). The retroactivity provision of the amendment is rationally related to the legitimate purpose behind the amendment of eliminating confusion in this area of law by clarifying that Mintz did not accurately reflect the existing New York Tax Law or the long-standing policy of the Department of Taxation and Finance with respect to transactions covered by the amendment. The duration of the retroactivity period is rationally related to its legislative goals and within the reasonable expectations of a taxpayer, since it has been pegged to the applicable statute of limitations for which a taxpayer could request a refund or the Department could assess additional tax. Plaintiffs fail to sufficiently demonstrate any cognizable detrimental reliance on the pre-2010 Tax Law, since the only statement of this law they purport to have relied upon was made in 2009 — two years after the transaction at issue. Therefore, plaintiffs do not meet their burden of establishing that the retroactivity provision of the 2010 amendment is unconstitutional as applied to them.
Accordingly, defendants’ motion for summary judgment is granted in its entirety and plaintiffs’ cross motion is denied in its entirety.
10. Governor as Defendant
One branch of defendants’ motion for summary judgment specifically seeks dismissal of all claims against Governor Andrew Cuomo. This branch has been rendered academic by the court’s grant of defendants’ motion for summary judgment dismissing the complaint in its entirety.
If summary judgment had not been granted in defendants’ favor, dismissal would still be warranted to the extent the complaint asserts claims against Governor Cuomo. The sole *988 basis offered by plaintiffs for naming Governor Cuomo as a party pertains to his duty under article IY § 3 of the New York State Constitution, which, in relevant part, provides that the Governor “shall take care that the laws are faithfully executed.” In opposition to this branch of defendants’ motion, plaintiffs include a quote from a footnote in Socialist Workers Party v Rockefeller (314 F Supp 984, 988 n 7 [SD NY 1970]), where the District Court held that Governor Rockefeller had “some connection” with the enforcement of the New York Election Law under the general power vested in him by article IY § 3 (id., citing Ex parte Young, 209 US 123, 156-158 [1908]). They also claim that the Governor of New York was found to be a proper defendant in a suit challenging the validity and constitutionality of portions of the New York Education Law based on his article IY § 3 duties (see Association of Am. Med. Colls. v Carey, 482 F Supp 1358 [ND NY 1980]). However, in Warden v Pataki (35 F Supp 2d 354 [SD NY 1999]), after noting that Carey provided some authority for plaintiffs’ attempt to base claims against Governor Pataki on his article IY § 3 general duties, the court stated that “the vast majority of courts to consider the issue have held — correctly . . . — that a state official’s duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute” (id. at 359 [citations omitted]; see also Wang v Pataki, 164 F Supp 2d 406 [SD NY 2001] [plaintiffs’ reliance on Carey was misplaced]). The court finds the sounder approach is the one adopted in Warden and Wang and chooses not to follow Carey. Because plaintiffs have not set forth any allegations connecting Governor Cuomo to the claims raised in their complaint other than his general duty to enforce the laws of New York, the branch of defendants’ motion seeking summary judgment dismissing the claims against Governor Cuomo is granted.
11. Attorneys’ Fees
Having determined that defendants are entitled to summary judgment dismissing the complaint in its entirety, the branch of plaintiffs’ cross motion which seeks an award of attorneys’ fees pursuant to 42 USC § 1988 (b) must be denied because plaintiffs are not a “prevailing party.”
Accordingly, it is ordered that defendants’ motion for summary judgment is granted and the complaint is dismissed with costs and disbursements to defendants as taxed by the clerk *989 upon the submission of an appropriate bill of costs;[4] and it is further ordered that plaintiffs’ cross motion for summary judgment is denied.

. Philip Caprio owned 51% of TMC’s stock and the remaining 49% was owned by Phyllis Caprio.

. “An ‘S’ corporation does not pay taxes on a corporate entity level, but instead, requires each shareholder to report his [or her] proportionate share of the ‘S’ corporation’s income on his [or her] individual tax return” (Masek v Wichelman, 67 AD3d 444, 446 [1st Dept 2009], citing Internal Revenue Code [26 USC] § 1366). “Both profits and losses of a corporate entity’s income flow through to shareholders individually” (id., citing Internal Revenue Code [26 USC] § 1367).

. Dence notes that one aspect of the agency’s position in 2002, as found in the PowerPoint, was later modified in 2004 but the Department’s position as relevant to plaintiffs’ transaction remains unchanged (doc 17, Dence aff 1Í 7).

. The court notes that defendants have specifically requested a judgment of dismissal, as distinguished from a judgment declaring the 2010 amendment constitutional when applied retroactively either generally, or specifically to these plaintiffs.